In re MINNEAPOLIS, ST. P. & S. S. M. RY. CO.

No. 13816.

District Court, D. Minnesota, Fourth Division.

Nov. 7, 1942.

James L. Hetland, E. E. Boyner, and Fordyce W. Crouch, all of Minneapolis, Minn., for trustees.

G. Aaron Youngquist, of Minneapolis, Minn., for debtor.

Kenneth F. Burgess and Douglas F. Smith, both of Chicago, Ill., for group of institutional investors.

Willard P. Scott (of Oliver & Donnally), of New York City, for mutual savings bank group.

Edward O. Lamb, of Toledo, Ohio, for Baldwin, Hawley, Smith and Hirsch, objectors.

Henry S. Mitchell, of Minneapolis, Minn., and Edward P. Flintoft and Frank C. F. Evans, both of Montreal, Canada, for Canadian Pac. Ry. Co.

Thomas Helmey (of Stinchfield, Mackall, Crounse & Moore), of Minneapolis, Minn., for Guaranty Trust Co. of New York.

Kenneth Taylor (of Kingman, Cross, Morley, Cant & Taylor), of Minneapolis, Minn., for Bankers Trust Co. of New York.

J. B. Faegre and R. J. Christianson (of Faegre & Benson), both of Minneapolis, Minn., for Central Hanover Bank & Trust Co.

NORDBYE, District Judge.

These proceedings came on for hearing on October 2, 1942, pursuant to orders dated July 7, 1942, and August 29, 1942, and upon due and sufficient notice on objections and claims for equitable treatment with respect to the plan of reorganization for the debtor approved by the Interstate Commerce Commission in its report of March 17, 1942, a supplemental report of June 17, 1942, and a supplemental order of June 17, 1942, certified to this Court by said Commission together with the record of the proceedings before it. The hearing before this Court concluded on October 2, 1942, subject, however, to a tentative continuance to October 24, 1942, if the Court should determine that further hearing was necessary, but such further hearing was not found to be necessary and was not held. At such hearing, the Court heard all parties in interest appearing in support of, and in opposition to, the plan, and all claims for equitable treatment. There was before the Court, in addition to the record before the Commission, the exceptions and briefs filed with the Commission, as well as the reports and orders of the Commission certified to this Court, together with the written objections and briefs filed by interested parties objecting to said plan.

The debtor filed its petition herein on December 31, 1937, under Section 77 of

the Bankruptcy Act, 11 U.S.C.A. § 205. On the same day, the Court approved the petition as properly filed. Thereafter, after hearing on January 29, 1938, G. W. Webster and Joseph Chapman were appointed trustees, and this appointment was ratified by the Interstate Commerce Commission on June 6, 1938. On March 19, 1941, the trustees, pursuant to instructions from the Court, prepared and filed with the Commission for its approval a plan of reorganization. The debtor joined with the trustees in the presentation of this plan, which had the approval of a group of institutional investors consisting of certain insurance companies, a group of mutual savings banks, and the Canadian Pacific Railway Company. Apparently, no other group of creditors had been organized, and it appears that these parties had cooperated in the preparation of the plan. They owned together $36,636,000 principal amount of the debtor's First Consolidated Mortgage bonds of a total outstanding issue in the sum of $71,147,000, or in excess of 51%. These investors also owned approximately $1,462,-000 of the debtor's Second Mortgage bonds of a total issue of $3,500,000, or about 41.77%. In addition, they owned, or were entitled to under certain pledge agreements, $20,607,750 of the debtor's First Refunding Mortgage bonds out of a total issue, including bonds pledged as collateral, of $26,-230,000, or approximately 77% of that issue. Hearings on that plan were conducted by the Interstate Commerce Commission at Washington, D. C., on May 20 and 21, 1941. On August 29, 1941, the Commission's examiner issued a proposed report on the plan. Thereafter, exceptions and briefs in support thereof were filed and oral arguments were heard before the Commission on October 28, 1941. The report of the Commission which approved a plan was issued March 17, 1942. Thereafter, petitions for modification of the Commission's plan were filed on behalf of several parties, and on June 17, 1942, a supplemental report was issued by the Commission wherein the plan as initially approved was in certain respects modified, and, as modified, the Commission approved and certified the same to this Court in pursuance of the provisions of the Bankruptcy Act.

## Operations of Debtor Company.

The debtor company operates railway lines in the States of Minnesota, North Dakota, Wisconsin, Michigan, Montana and South Dakota. It controls the stock of the Wisconsin Central Railway Company, which has lines of railroad in the States of Wisconsin, Minnesota, Illinois, and Michigan. On December 2, 1932, a Receiver was appointed for the Wisconsin Central, and this company is still in receivership. Its lines are operated by the debtor company, pursuant to an operating agreement terminable on six months' notice, or at any time by the Court. Stock control of the debtor company is held by the Canadian Pacific Railway Company. It would appear that the lines of the debtor were developed largely as a complement or a subsidiary of the lines of the Canadian Pacific. Connections with a Canadian Pacific line are had at Portal, North Dakota, with the Canadian Pacific line running south from Winnipeg at Noyes, Minnesota, and in the East at Sault Ste. Marie, Michigan. In 1890, 1899, and 1925, the Canadian Pacific entered into certain agreements with the debtor whereby it guaranteed the interest on certain bonds issued by the debtor and whereby the debtor agreed that, in so far as it could lawfully do so, it would deliver to and interchange with the Canadian Pacific all its traffic to and from points reached by the lines of said Road or its connections. Apparently, there was no corresponding agreement with reference to traffic which rested upon the Canadian Pacific, but the debtor has enjoyed during said years and up to July 1, 1940, substantially all of the traffic of the Canadian Pacific which could be moved over the debtor's lines. Prior to July 1, 1940, a substantial part of the traffic received by the debtor from the Canadian Pacific was delivered at Portal, North Dakota. Much of this traffic could have been interchanged at Noyes, Minnesota, a point farther east. As of July 1, 1940, the Canadian Pacific, in order to obtain the benefit of the long haul on traffic from the West, began to deliver such traffic to the debtor at Noyes, Minnesota, instead of Portal, North Dakota, which resulted in a shorter haul for the debtor and in a material decrease in its revenues. Recognizing that the interchange of traffic at Noyes and Sault Ste. Marie could be diverted by the Canadian Pacific to other carriers and that a substantial part of the debtor's revenues on freight was obtained from traffic received from the Canadian Pacific, the trustees herein, in order to preserve the remaining traffic relationship with the Canadian Pacific, entered into negotiations with representatives of that Road looking to some future arrangement which would be mutually satisfactory. The representatives of the

institutional and mutual groups, after careful studies, likewise recognized that the maintenance of a traffic relationship with the Canadian Pacific was a matter of vital importance to the debtor. It appears that, during the years 1936–1940, the debtor received yearly from the Canadian Pacific an average of some 27,000 carloads of freight traffic. It delivered in return an average of 9,500 carloads a year. Revenue to the debtor of the traffic thus received amounted to some $2,000,000 per year, or 16.6% of its total carload revenue. It may be pointed out that, of the total carloads which were moved by the debtor during these years, some 13 to 17% were received from the Canadian Pacific. The revenues derived by the debtor from carloads interchanged with, and· moving to and from, the Canadian Pacific total some 25% of the total of the debtor's carloads. The interchanged traffic of the Canadian Pacific with the debtor only constituted some 3½% of the former's total freight revenues. Moreover, as indicative of the character of the interchanged traffic, it appears that, during the year 1937, which was the year selected for study by the two large creditor groups, the debtor received from such traffic an average gross revenue of $84.35 per car, which is between 50 and 60% in excess of the debtor's earnings per car from all other rail carload traffic. It is undisputed that most of the traffic received by the debtor from the Canadian Pacific could be diverted to other lines. In the year 1937, the debtor's gross revenue of Canadian Pacific carload traffic was $3,247,097, and studies made for that year show that 95.5% of that amount, or $3,099,934, was earned on competitive traffic. Reference may be made to the fact that, during the long and close association between the two Roads, much business has been developed as a result of cooperation between their respective traffic departments. This has resulted in the debtor's receiving substantial revenues on the intermediate haul which would be subject to diversion. It appears that, on the competitive carload traffic of $3,099,934 during the year 1937, $2,272,006, or 73.3%, was obtained from overhead or intermediate traffic. Furthermore, it appears that the debtor is substantially dependent on the Canadian Pacific for passenger traffic revenue. For the years 1929, 1931, and each of the five years ending December 31, 1940, interchanged passenger traffic constituted, from a low of 40% in 1931, to a high of 54% in 1939 of the debtor's total passenger traffic revenues. In commenting upon this showing, the Commission stated that "the evidence is convincing that the existence of a traffic arrangement with the Canadian Pacific is vital to the debtor." (Printed record, p. 1234). And again, in commenting upon the necessity for future assistance and cooperation from the Canadian Pacific, the Commission pointed out that, "Without such assistance, it is our view that the debtor's future traffic would be insufficient to produce earnings available for payment of interest or dividends on any substantial amount of new securities." (Printed record, p. 1215). It is quite apparent from the record that the continuation of such a traffic arrangement could only be obtained by devising a plan whereby the Canadian Pacific would again be afforded an opportunity to reestablish a sufficient equity in the debtor's properties so as to revive and maintain the close relationship which has existed between these two systems. The necessity of such arrangement was recognized after much study and consideration by all of the interested groups, and there is substantial unity among all of the creditors that a satisfactory traffic arrangement with the Canadian Pacific is the keystone to a successful reorganization.

### Present Capitalization.

As of December 31, 1940, the debtor's total capitalization was approximately $169,202,628. This sum includes grants in the aid of construction in the sum of $612,299. The other items included therein are:

Secured obligations and long-term notes:

| | |
|---|---|
| Equipment obligations, including trustees' obligations | $ 2,663,829 |
| First Consolidated Mortgage 4% bonds, due July 1, 1938* | 56,863,000 1 |
| First Consolidated Mortgage 5% bonds, due July 1, 1938* | 14,284,000 2 |

1 The mortgage provides for a rate of 5% on the bonds, but beginning July 1, 1890, the Canadian Pacific guaranteed payment of interest at the rate of 4% on this principal amount.

* Some of the holders of these bonds contend that the guaranty of interest by the Canadian Pacific on the First Consolidated Mortgage bonds, which matured on July 1, 1938, continues after the maturity date. Suits have been instituted by several bondholders, and while the results have been contrary to the bondholders' contentions, there is a possibility that additional suits may be commenced in other courts by other bondholders.

2 Of this principal amount, the Cana-

| | |
|---|---|
| Second Mortgage 4% bonds, due January 1, 1949 | 3,500,000 [3] |
| First Refunding Mortgage 6% bonds, Series A, due July 1, 1946 | 2,124,000 |
| First Refunding Mortgage 5½% bonds, Series B, due July 1, 1978 | 12,106,000 |
| 25 Year Secured Gold notes, due March 1, 1949, 5½% | 2,438,800 |
| Total | $98,979,629 |

Short-term notes of the debtor:

| | |
|---|---|
| Notes issued to the Reconstruction Finance Corporation, due February 27, 1937 | $ 1,162,245 |
| Notes issued to the Reconstruction Finance Corporation, due February 1, 1938 | 5,000,000 |
| Notes issued to the Railroad Credit Corporation, due 1936 | 571,513 |
| Notes due February 1, 1938 | 5,000,000 |
| Total | $11,733,758 [4] |

Debtor's non-negotiable debt to affiliated companies:

| | |
|---|---|
| Advances by the Canadian Pacific | $25,044,406 |
| Advances by the Western Express Company | 10,000 [5] |
| Total | $25,054,406 |

Debtor's capital stock:

| | |
|---|---|
| Preferred stock 7% non-cumulative | $12,603,400 |
| Common Stock | 25,206,800 |
| Premium on capital stock | 12,336 |
| Total | $37,822,536 |

In addition, there was interest due on the bonds and long and short-term notes issued by the debtor and interest on advances, all totaling some $23,990,425. The debtor had guaranteed the interest on the First and Refunding bonds of the Wisconsin Central which were in default, and the matured and unpaid interest thereon amounted to some $777,000. The debtor was also severally and jointly liable with the Central Terminal Railway Company for principal and interest on $1,071,000 principal amount of the latter's First Mortgage bonds. It also was jointly and severally liable with eight other railroads on $14,862,000 principal amount of First and Refunding bonds, Series A, of the St. Paul Union Depot Company. Certain claims have been made against the debtor by the Wisconsin Central which grow out of the operation of the latter's property by the debtor, but the validity of such claims is denied by the debtor.

Proposed Capitalization under Plan.

Under the plan as approved and certified by the Commission, the effective date thereof is January 1, 1941. The Commission found the value of the property for the purposes of reorganization to be approximately $95,000,000. The trustees had proposed a value of $105,000,000, and the examiner had recommended a value of $87,000,000. It appears that the average earnings of the debtor company in the period 1921 to 1930, inclusive, available for the payment of interest, were $5,738,714, and for the period 1931 to 1940, inclusive, the average was $884,335. It will be observed that the first period encompasses years before any serious truck and bus competition had entered the transportation field. During the second period, in addition to encountering such competition, the debtor's territory was visited by years of drouth and a serious economic depression. The Commission found that various pertinent considerations justify the propriety of capitalizing earnings at 4¼%. If the average earnings were capitalized on this basis for the years 1921 to 1930, inclusive, a capitalization of $136,087,300 would be obtained, and the average earnings thus capitalized for the years 1931 to 1940 would produce a capitalization of approximately $20,807,800. It is significant, however, that the earnings for the year 1941 were approximately $2,735,000 without deduction of the special equipment amortization charges. This return capitalized produces a capitalization of $64,326,589. The prospect for more favorable earnings in the future, the return of adequate moisture conditions in the area served by the debtor, and the improvement in conditions generally throughout the Nation, prompted the Commission to arrive at the figure of $95,000,000. The total capitalization of the reorganized company on this basis,

---

dian Pacific guaranteed payment of interest at the rate of 5% on $8,136,000.

[3] The Canadian Pacific guaranteed the payment of interest on the principal.

[4] All of this total of short-term notes except $11,000, principal amount, are now held by the Canadian Pacific.

[5] The loan bears no interest.

therefore, will be approximately as follows:

Equipment obligations, including the trustees' obligations maturing 1944, 1945 and 1948 ..................................... $ 2,663,829
First Mortgage Series A 4½% Income bonds, due January 1, 1971............... 10,000,000
General Mortgage Series A 4% Income bonds, due January 1, 1991............... 20,129,076
Common stock no-par value, 719,180 shares 62,209,070

Total ................................... $95,001,975

█ It is provided that, of the $10,000,000 First Mortgage bonds, Series A, $1,948,369 shall be held in the treasury of the reorganized company and used to reimburse the company for reorganization expenses and for other proper corporate purposes. Furthermore, all of the outstanding equipment obligations of the debtor and/or trustees shall be assumed by the reorganized company. On the basis proposed, the capital structure in the plan will consist of $30,844,536 of debt, not including the $1,948,369 held by the treasury of the reorganized company. Of this debt, however, only $2,663,829 in equipment trust obligations will bear fixed interest. The interest on all bonds to be issued will be contingent. It is significant to note, therefore, that the fixed annual charges are decreased from approximately $6,632,759, which the debtor's present obligations bear, to some $54,852. The various elements of uncertainty pointed out in the Commission's findings fully warrant the conclusions reached as to the necessity of having income bonds.

### Distribution of Assets under Proposed Plan.

█ The new First Mortgage bonds and the General Mortgage bonds are to be issued exclusively to the holders of the outstanding First Consolidated Mortgage bonds. These First Consolidated bondholders will receive approximately 10% of their claims in the new First Mortgage Series A 4½% income bonds and approximately 25% of their total claims in the new General Mortgage 4% Series A income bonds. Voting trust certificates will be issued representing approximately 0.727 share of the new no-par common stock for each $100 of the total claims of such First Consolidated bondholders. In addition, they are to receive payments in cash approximating 3.3% of their total claims, including all accrued and unpaid interest to January 1, 1941, which is not paid by the Canadian Pacific under its guaranty. Holders of the present outstanding Second Mortgage bonds, except those held by the Canadian Pacific, which mature January 1, 1949, all of which bear the interest guaranty of the Canadian Pacific, will receive cash payment from the Canadian Pacific of their guaranteed interest maturing January 1, 1938, to January 1, 1941, inclusive. They will receive voting trust certificates representing approximately 1.168 shares of the new no-par common stock for each $100 of their claims. The First Refunding Series A 6% Mortgage bondholders, whose bonds mature July 1, 1946, and which do not bear the Canadian Pacific interest guaranty, will receive for each $100 of their total claims, including accrued and unpaid interest as of January 1, 1941, voting trust certificates representing approximately 0.195 share of new no-par common stock. Holders of the outstanding First Refunding Mortgage Series B 5½% bonds maturing July 1, 1978, all of which bear the Canadian Pacific interest guaranty, will receive cash payment from the Canadian Pacific for their interest maturing January 1, 1938, to January 1, 1941, inclusive, and for the balance of their claims they will receive for each $100 of such claims voting trust certificates representing approximately 0.195 share of new no-par common stock. In addition, the holders of the First Refunding Mortgage bonds, Series A and B, will receive their distributive share of $10,000,000 principal amount of First and Refunding bonds due April 1, 1959, of the Wisconsin Central Railway Company, which bonds are now pledged as collateral security for the payment of the debtor's First Refunding Mortgage bonds.

█ As above stated, the Canadian Pacific has guaranteed the interest on the outstanding First Mortgage Consolidated bonds, the Second Mortgage bonds, and Series B of the debtor's First Refunding bonds. Under the plan, the Canadian Pacific will be allocated a specific number of voting trust certificates in return for the payment of interest on the First Consolidated Mortgage bonds, since the commencement of the trusteeship, January 1, 1938, to the date of the maturity of such bonds, July 1, 1938, and as to the Second

Mortgage bonds, upon which the guaranteed interest has been paid, a specified amount of voting trust certificates would be allocated in return for the payment of interest from the commencement of the trusteeship to the effective date of the plan. It will receive for each $100 of interest so paid on guaranteed First Consolidated bonds, voting trust certificates representing approximately 1.174 shares of new common stock, and for each $100 of interest so paid on Second Mortgage bonds, voting trust certificates representing 1.156 shares of new no-par common stock. Any claim of the Canadian Pacific as to payments under its guaranty on the First Refunding Series B bonds maturing January 1, 1938, to January 1, 1941, inclusive, is not entitled to participate under the plan because the claims of the Refunding bondholders cannot be satisfied within the limits of the approved capitalization, and therefore no provision has been made for its satisfaction. Furthermore, any claim of the Canadian Pacific arising out of the payment or provision for payment by it maturing subsequent to January 1, 1941, pursuant to any guaranty of interest on any of the debtor's present bonds, will not be accorded any rights in the distribution of the debtor's assets.

### Capital Fund.

■ The plan provides that there shall be created by the necessary covenants in the First Mortgage and in the General Mortgage of the reorganized company, a capital fund which shall be segregated from other funds. It is provided that there shall be paid into this fund on or before March 1st of each year beginning in 1942, by an appropriation out of the preceding year's available net income as defined in the plan, the sum of $250,000, plus such additional amount as the Board of Directors of the reorganized company by vote of two-thirds of the entire number of Directors may determine. However, it is provided that any additional amount, when added to the required payment of $250,000 (but not including any deficiency being made up as the plan provides) shall not exceed 2% of the railway operating revenues of the preceding year. If the available net income in any year is less than $250,000, the deficiency may, in the discretion of the Board of Directors, be made up in the next succeeding year and not thereafter, before the payment of any

accumulated contingent interest on First Mortgage bonds, any contingent interest on General Mortgage bonds, or dividends on stock. The plan contains pertinent provisions regarding the use of this capital fund, but generally it may be stated that it shall be used either to provide for or to reimburse the treasury of the reorganized company for all or any part of the expenditures, to the extent not otherwise financed, chargeable to investment in road and equipment account, improvements on leased property account, and miscellaneous physical property account, as defined by the Commission's accounting rules if in force and effect, and if not, then in accordance with sound accounting practices. This fund may also be used to pay the costs of additions and betterments which are funded or fundable into bonds to the extent such cost is not provided for through said bonds. Suitable provisions appear in the plan to safeguard the use of this fund and it cannot be made the basis for the issuance of any securities other than common stock.

### Voting Trust.

■ A voting trust will be created and is to continue until December 31, 1950. As long as the traffic agreement exists between the debtor and the Canadian Pacific during the period of the voting trust, the number of the voting trustees shall be five, to be designated as follows: One by the group of institutional investors; one by the mutual savings bank group; one by the Canadian Pacific (as an owner of the debtor's bonds), and two additional voting trustees by the Canadian Pacific during the period of the trust and as long as the traffic agreement between the parties remains effective. The Board of Directors of the reorganized company shall be elected by the voting trustees. It is further provided that, during the period of the voting trust, the Canadian Pacific, if it agrees to extend the traffic agreement for a period of eight years from January 1, 1951, will have the option to purchase 33% of the stock issued by the reorganized company to others than the Canadian Pacific, the option price of the stock to be $2 per share.

### Deposit Agreements.

■ In order to preserve the rights of the owners of the debtor's unmatured

bonds wherein interest is guaranteed by the Canadian Pacific, deposit agreements have been arranged. Such agreements as approved by the reorganization managers will be executed as between the reorganized company, the depositary trustee, and the Canadian Pacific. Holders of such bonds who may wish to preserve their rights against the guarantor may become parties to such deposit agreement by delivering their bonds to the depositary trustee with instructions, in lieu of cancelling such bonds for all purposes, to hold them together with the voting certificates allotted with respect thereto pursuant to the terms of the deposit agreement. The bonds so deposited will be cancelled as of January 1, 1941, as a claim against the debtor and against the property subject to said mortgage. Claims for interest under the guaranty will be reserved by a suitable endorsement thereon. Appropriate certificates of deposit will thereafter be issued to such depositors of bonds, and the rights under the guaranty are fully protected so as to insure the holders of the new securities an annual return equal to the interest guaranteed under the old bond during the period of such guaranty. Any holder who fails to deposit his bonds under such agreement will nevertheless be accorded the benefit thereof, and it is provided that the deposit agreement shall be carried out for his benefit as though his bonds were actually on deposit. Subject to the conditions of the deposit agreement, provision is made for covenants on the part of the Canadian Pacific that participating in the deposit agreement shall in no way affect, limit, or prejudice the rights of the holders under the guaranty. The purchase price of the option stock when paid and/or the proceeds from the sale of the Wisconsin Central bonds, the latter being held as collateral to Series B First Refunding bonds, shall reduce ratably the principal of both deposited and undeposited bonds to the extent of the credit thereon, and after the notice provided for in the plan, the liability of the Canadian Pacific as guarantor shall only apply to such reduced principal amount. Needless to say, to effect a practical and workable reorganization of the debtor company, in which the rights of the bondholders under the guaranty could be protected, has presented a complex and untoward situation. The plan in this regard, however, seems eminently fair and feasible.

## Reorganization Managers.

It is provided in the plan that the reorganization managers shall carry out the plan under the supervision and control of the Court. They shall be three in number; one to be designated by the institutional group, one by the savings bank group, and one by the Canadian Pacific. The traffic agreement between the debtor and the Canadian Pacific has been submitted to the Commission and has received its approval, and it becomes an integral part of the plan.

## Objections of the Baldwin Group.

Objections to the plan had been filed by the so-called Baldwin group of First Consolidated bondholders. It is asserted that this group represents some $100,000 in bonds. Their objections may be summarized as follows:

1. That the plan does not assure to the owners of the First Consolidated bonds the retention of their asserted rights against the Canadian Pacific upon their claim of guaranty of interest after maturity on said bonds.

2. That preference is granted to the Canadian Pacific as a creditor in an inequitable and disproportionate advantage.

3. That the plan fails to provide for a sinking fund for the new First Mortgage bonds.

4. That the effective date of the plan, January 1, 1941, is impractical and unwise.

5. That there is inequity in the treatment accorded to the various general classes of creditors.

6. That the proposed plan provides a preference in favor of the Canadian Pacific Railway Company.

7. That the plan fails to accord adequate representation of bondholders other than the institutional and savings bank groups on the voting trust.

These objections will be considered in the order stated.

I. There is nothing in the plan which in any way limits or prejudices the rights of the First Consolidated bondholders to litigate their asserted claim against the Canadian Pacific to guaranteed interest on the bonds after maturity. Some of the members of the group which are now objecting, and others, have heretofore instituted suits seeking to establish such lia-

bility. This litigation has to date proved unsuccessful, and the following courts have disposed of such litigation adversely to the claimants. Hirsh et al. v. Canadian Pacific Ry. Co., 1941, 69 Ohio App. 102, 43 N.E.2d 304 (demurrer to complaint sustained); Milligan v. Canadian Pacific Ry. Co., Court of Common Pleas, City of Detroit, action begun in October, 1939, not reported (judgment for defendant); Milligan v. Canadian Pacific Ry. Co., Circuit Court Wayne County, Michigan, action begun in December, 1939, not reported (judgment for defendant). But notwithstanding, it is asserted that future litigation may be instituted by other First Consolidated bondholders. If so, such suits may proceed without hindrance from any provision of the plan. Obviously, the question of the liability of the Canadian Pacific after maturity on its guaranty of interest is disputable. The guarantor has always denied liability. Apparently, it was not deemed possible or practical to determine finally that question in the plan. The time which will be allotted to bondholders within which to deposit their bonds under the plan will undoubtedly afford any bondholder who wishes to litigate the question of the liability of the Canadian Pacific ample opportunity to do so. Some four years have now elapsed since the Canadian Pacific denied liability for interest on these bonds after July 1, 1938. There has been no disposition on the part of the proponents of this plan to limit or restrict any future litigation in this regard. The suggestion has been made that these bondholders should be permitted to receive their cash and the securities allotted to them and to retain their present bonds, with a suitable endorsement or stamp to the effect that they have received the cash and securities allotted to them under this reorganization. But it is pointed out that there are sound objections to such an arrangement and that serious complications might arise if that plan were followed, as certain bondholders who might desire to conduct litigation could, under such a plan, sell their new securities and retain their old bonds. There would be no way of determining where such divided ownership might exist. The Canadian Pacific could properly object to the payment of any interest or dividends on the new securities on the ground that, if ultimately it were held liable for interest after maturity, such liability should be reduced by the income on the new securities allotted to the bonds involved. The Com-

mission, in considering this objection, made this statement which appears to be sound and sensible:

"A suggestion by one of the interveners that the plan provide that the holders of First Consolidated bonds, which bear the interest guaranty, be permitted to receive their new securities and, at the same time, retain their present bonds upon having them cancelled, but with a reservation of all rights against the Canadian Pacific as guarantor, does not appear to be required in the interest of fairness. Such bondholders need not deposit their bonds until satisfied that it is to their advantage to do so, but until they have so deposited them they should not be permitted to receive the new securities and the returns thereon, while still contending for their alleged rights under the guaranty to receive payments of interest from the Canadian Pacific accruing subsequent to the maturity date of their bonds. This proposal is not approved." (Printed record, p. 1218).

Moreover, the failure to deposit bonds by bondholders desiring to conduct litigation will not prejudice their rights to the dividends and interest on securities allotted to them. Such accrual will be held to the credit of the undeposited bonds. While the exact date when First Consolidated bondholders must deposit their bonds has not been determined by this Court, all parties will be afforded an opportunity to be heard on that matter. Regardless of the possibility of any future suits which may be filed on the guaranty question, the very nature of these proceedings will require some years in which to permit bondholders here and abroad to exchange their bonds.

II. This objection is apparently based on the treatment accorded in the plan to the Canadian Pacific for interest paid on the First Consolidated and Second Mortgage bonds from the advent of the proceeding herein to the effective date of the plan, January 1, 1941. The objectors assert that, in that unsecured creditors are found to be without any equity in the plan, the payment of such interest during the period indicated merely results in the Canadian Pacific's being an unsecured creditor in such amounts, and therefore it should not be accorded any better treatment than the ordinary unsecured creditor. But clearly the objectors mistake the real nature and character of the transaction. Interest is secured equally with the principal under the terms of the mortgage. Payment of

such coupons pursuant to the guaranty therefore results in the Canadian Pacific's being subrogated to the lien of the mortgage to the extent of such payments, in subordination to the rights of the bondholders. Under the proposed plan, the Canadian Pacific receives only stock, as hereinbefore indicated, while the First Consolidated bondholders receive the cash, the First Mortgage and General Mortgage bonds, and stock allotted on a more favorable basis than that accorded the Canadian Pacific. As to the Second Mortgage bonds, the Canadian Pacific receives for the interest paid, pursuant to its guaranty, stock on a less favorable basis than that accorded the Second Mortgage bondholders. The amounts allotted to the Canadian Pacific for such claims seem fair and equitable. There is no cause for complaint on the part of the bondholders in this regard. It may be observed in passing that, as an unsecured creditor, the Canadian Pacific has a claim of $25,044,406 for advances, with $7,937,512 accrued and unpaid interest. As to this claim, the plan provides no satisfaction.

██ III. This objection is leveled at the failure of the plan to provide for a sinking fund for the new First Mortgage bonds. This is an open-end mortgage. In regard to the objection urged, the Commission in answer to the same objection, stated: "The relatively small amount of the issue should insure payment or refunding of the bonds at maturity and a requirement for a sinking fund would place an unnecessary burden upon earnings available for payment of a return upon the new junior securities." (Printed record, p. 1226).

Viewing the plan as a whole and giving due recognition to the rights of the senior and junior equity holders, it would seem that the Commission's observation is sound and should not be disturbed. Certainly, in view of the small amount of the issue, the failure to provide for a sinking fund should not impair the true value of the bonds. Moreover, in view of the security afforded and the relatively small amount of the issue, the reorganized company should not encounter any difficulty in providing means for payment or refunding. It should be noted that any additional First Mortgage bonds issued with the approval of the Board of Directors will contain suitable sinking fund provisions if the Board so provides. Under the circumstances, therefore, it seems that sound business prudence has been observed in providing reasonable safeguards in the issuance of the mortgage referred to.

██ IV. This objection relates to the effective date of the plan. In the brief of the objectors, this point was not urged. However, the Court was asked to "consider the wisdom of the effective date." No injustice or inequity to any creditors by reason of the proposed date is pointed out, except that there is an intimation that greater Federal taxes might result if a later date is not provided. Undoubtedly, if the effective date were postponed, greater debt accumulations would result, and the amounts of the claim of the bondholders would substantially exceed the present figure. In fact, the increase in the claims of the senior mortgage in the event a later date were provided might result in but little, if any, equity to the junior issues. No suggestion is made that it will be impractical to carry out the various details of the plan if the proposed date is approved. The cash position of the company will permit the retroactive payments to be made as provided in the plan without any serious difficulty. Indeed, there is no showing that the effective date is unwise, impractical, or inequitable. The showing is quite to the contrary. It therefore should not be disturbed.

██ V. The exact nature of this objection as set forth in the schedule of objections filed is somewhat obscure. However, there is reference to the alleged discrimination as between the amount of cash and securities received by the bondholders whose interest is guaranteed by the Canadian Pacific as compared to that which is allotted to unguaranteed bonds. That is, holders of the First Consolidated bonds, where interest is not guaranteed, receive per $1,000 bond (these figures are approximate)—$39.42 in cash, $117.50 in new First Mortgage bonds, $293.75 in new General Mortgage bonds, and 8.54 shares of no-par common stock. Holders of First Consolidated bonds, with interest guaranteed, receive per $1,000 bond (figures are approximate)—$37.83 in cash, $112.76 in new First Mortgage bonds, $281.90 in new General Mortgage bonds, and 8.20 shares of no-par common stock. The explanation, however, is simple. No interest has been paid on the unguaranteed bonds since July 1, 1937, whereas interest on the guaranteed bonds has been paid to and includ-

ing July 1, 1938. It follows, therefore, that the unguaranteed bonds have a larger claim to the extent of one year's interest, and the alleged discrimination is only apparent and not real.

■ VI. This objection is primarily directed at the stock control which is afforded the Canadian Pacific by reason of the option accorded to it to purchase 33% of the new common stock to be issued. This option may be exercised at any time during the period ending December 31, 1950, if the traffic agreement is in effect. Certainly, if the debtor company as reorganized could divorce itself from the Canadian Pacific and enter upon a competitive basis with the other railroads for the interchange of business with that system, there would be no purpose in granting a stock option on the basis proposed. But long and exhaustive studies of the relationship of the debtor to the Canadian Pacific have convinced various creditor groups, as well as the trustees, that the continuation of the vital relationship between these two roads is unquestionably necessary, and when we speak of the necessity of a continuation of the vital or historical relationship which has existed between the two roads for more than fifty years, the continuation of a mutually satisfactory traffic arrangement is necessarily embraced. At the outset, it is evident that the Canadian Pacific is not required to continue the traffic arrangement which has existed in the past. This was demonstrated when it assumed for itself the benefit of the long haul on east-bound traffic over its lines requiring an interchange with the debtor at Noyes, Minnesota, instead of Portal, North Dakota. In addition, it is apparent that, from a strictly business standpoint, the Canadian Pacific could utilize the facilities of other competing carriers in the interchange of traffic, and if the interchange of traffic is to continue exclusively with the debtor at the available connecting points, it can only be assured by enabling the Canadian Pacific to acquire a substantial stock interest in the debtor company. One may urge that the proposed traffic arrangement should continue for a longer period of years, or that less favorable terms should be accorded the Canadian Pacific in enabling it to acquire substantial stock control. But we are confronted with the undeniable fact that the traffic agreement and the consideration therefor are the results of studies and negotiations on the part of the creditor groups and the trustees, and are the most favorable which can be obtained. The Commission has found the entire arrangement to be fair and equitable, and in this the Court is fully in accord. The peculiar problems confronting the reorganization of the debtor require a realistic and practical consideration of the entire situation. The fact that the debtor company has grown up as a complement to the Canadian Pacific system cannot be ignored.

■ VII. This objection refers to the alleged failure of the plan to afford representation as voting trustees to any of the representatives of the First Consolidated bond group, except the institutional and savings bank groups. The completion of this plan is in no small part due to the long and protracted studies and efforts on the part of these two groups. Undoubtedly, their experience in railroad reorganization will redound to the expedition and final consummation of this plan. No other creditor groups made any noteworthy contribution to the plan. Their interest in assuring a successful and prosperous reorganized company is the same as that which would be entertained by all of the First Consolidated bondholders; that is, they will hold in the reorganized company the identical character of securities which will be held by the so-called minority groups, and that which will enhance and safeguard their investment will also inure to the benefit of all holders of the same class of securities. It will be to their interest, therefore, to name as voting trustees men of experience, integrity and foresight. No one can seriously question the desirability of a voting trust. Without such arrangement, there would be no continuity or stability in the management or policy. In launching a reorganized railway company of this size, one must recognize that, without suitable safeguards during the formative years, the entire future of the company may be seriously jeopardized. The right of the Canadian Pacific to name the majority of voting trustees will continue only so long as the traffic agreement approved by the Commission remains in effect. This arrangement has been thought wise, prudent and practical by those who control a substantial portion of the debtor's outstanding bonds, the trustees of the Road, and the Interstate Commerce Commission. There is an entire absence of any showing that

the rights of the minority groups of bond-holders will not be fully protected by this feature of the proposed plan. It may be noted that any amendment of the traffic agreement between the two systems requires an affirmative vote of at least four-fifths of the Directors.

The several objections of the Baldwin group are found to be without merit and cannot be sustained.

### Objections of the Guaranty Trust Company.

The trustees of the third lien on the property—the First Refunding mortgage—object to the capitalization as proposed by the plan and urge that it be increased so as to obtain a larger allocation of common stock to this group of bondholders. The Commission in fixing the capitalization necessarily exercises its legislative function as a fact-finding body in determining the value of the debtor's property. Obviously, the determination of the value of any railroad property suggests consideration of the many factors entering into that question by experts in that field. Section 77(e) of the Bankruptcy Act provides: "If it shall be necessary to determine the value of any property for any purpose under this section, the Commission shall determine such value and certify the same to the court in its report on the plan."

The Circuit Court of Appeals for the Sixth Circuit, in a proceeding under Section 77, made the following statement which seems basically sound: "The determination of the value of the properties, and the amount and character of capitalization, are legislative functions affecting the public interest and are exclusively within the province of the Commission under the Act. The only qualification is that the court shall independently determine whether, in the exercise of its jurisdiction, the Commission has acted fairly within the bounds of the Constitution and not arbitrarily." Akron, Canton & Youngstown Ry. Co. v. Hagenbuch et al., 128 F.2d 932, 940.

There is no contention that the capitalization as determined by the Commission was arrived at arbitrarily, or that it is without reasonable support in the record. Giving due consideration to the record herein and the Commission's findings, the past and present earnings, and the future earning probabilities of the Road, the physical value of debtor's property in light of such earnings, and all other relative and material factors which may bear upon the question of value, it is the Court's opinion that the value of the debtor's property, for the purpose of this proceeding, is substantially the sum recommended by the Commission. Contentions have been made that, in railroad reorganization proceedings, the tendency is to be too conservative in arriving at values for the purpose of capitalization, and that, by reason of the number of railroad lines involved in receivership and the vexatious and perplexing problems confronting rail carriers in recent years, the deflation in values has been entirely too drastic. But while the rail lines due to abnormal times are now seemingly prosperous, it would be a most short-sighted policy to ignore the problems which are bound to face the transportation systems again, with the return of normal competition by competing agencies, the cessation of abnormal traffic movements on account of the War, and the postwar economic problems, all of which may have a pronounced effect on the earnings of the reorganized company. Then, again, it may be noted that the lines of the debtor are primarily dependent on the movement of agricultural products. The products of the forest and the mine have steadily become a less important factor in producing traffic. The history of the Northwest is replete with the disastrous results brought about by the cycles of dry years. Diversified farming and improved agricultural husbandry will undoubtedly curb the effects of abnormally dry years, but no one can say that, in the near years to come, the area largely served by the debtor will not be again suffering from repeated crop failures due to drouth and plague which will markedly decrease the gross income of the company. Certainly, a conservative capitalization which will enable the creditors and stockholders to obtain a fair return on their investment in good times and insure a going concern free from the fear of receivership and bankruptcy in the leaner years, thus enabling the carrier to render adequate service to the public at all times, should be the primary objective of every reorganization. The petition of the Guaranty Trust Company for increased capitalization should therefore be, and is, denied.

### Provisions Made for Creditors Holding Collateral.

No question is raised as to the soundness of the Commission's findings in its disposition of claims coming within this category. They may, however, be mentioned briefly. Certain notes were issued to Reconstruction Finance Corporation which totaled, with interest, on January 1, 1941, some $7,169,909. These notes are now owned by the Canadian Pacific. Certain securities have been pledged as collateral security for the payment of these notes. Such collateral is of a value considerably less than the amount due on the notes. It is provided, therefore, that the debtor will release and surrender all right and title to the collateral, and as to any further claim of the holder of said notes, the same will be treated as unsecured and no provision is made therefor in the plan. As to this particular transaction, it appears that certain claims of the debtor against the issuer of the collateral are subordinated to the rights of the holders of the notes against such collateral. Such subordination is recognized herein.

Certain notes were issued to the Railroad Credit Corporation totaling, with interest, some $604,184.84. These notes are owned by the Canadian Pacific. Stock of the Belt Railway Company of Chicago is held as part collateral for the payment of these notes. The collateral security, including the stock of the Belt Line, totals some $3,250,000 in par value, and is of such actual value so as to justify its retention. These notes, therefore, with interest, reduced by income and payments received on the collateral, are to be paid in cash and the collateral released from the pledge lien. The Belt Railway Company stock, with other collateral, is to be pledged under the new General Mortgage, and the Wisconsin Central Railway Company, by reason of its interest in the facilities furnished by the Belt Line, is granted certain prior rights to purchase the stock of that company if it should be sold by the debtor in pursuance of the terms of the new General Mortgage.

There are outstanding the debtor's 6% notes totaling, with interest, to January 1, 1941, some $5,999,908.26. These notes matured February 1, 1938. All but $11,000 are held by the Canadian Pacific. First Refunding bonds issued by the debtor in the principal amount of $6,250,000 are pledged as collateral security. This security will be surrendered to the holders of these 6% notes and any further claim thereon will be treated as an unsecured claim, and there is no provision as to its satisfaction.

There are outstanding, with interest, $2,894,734.38 of twenty-five year Secured Gold Notes, maturing March 1, 1949. There is held as security for such notes 56,420 shares of Wisconsin Central common stock. This stock is to be surrendered to the holders of the Gold Notes, and no provision is made for the recognition of any balance that may be due thereon.

At the time the Wisconsin Central and the debtor company entered into a lease on April 1, 1909, under which the debtor operated the Wisconsin Central properties in accordance therewith, an agreement was entered into simultaneously whereby certain leased-line 4% stock certificates were issued to the holders of the Wisconsin Central preferred stock in return for a deposit of such preferred stock for the benefit of the debtor company. The plan provides that, upon order of court, the agreement shall be disaffirmed and the preferred stock released to the holders of the leased-line certificates. Any additional claim by the holders of the leased-line certificates is treated as an unsecured claim, and no provision is made for its satisfaction in the plan.

The arrangements above noted with reference to the disposition of claims secured by collateral are found to be fair and equitable, and are in all things approved.

### Stockholders and Unsecured Creditors.

The Commission has found that, as of December 31, 1937, the date of the filing of the petition herein, any assets of the debtor not subject to liens of secured creditors were substantially less in value than the amount of current liabilities as of that date for wages accrued, taxes, vouchers payable, car service balances payable and other current items, and that, for this reason, there were no "free assets" available to satisfy the claim of general unsecured creditors not entitled to preference. That this finding is fully supported by the evidence seems clear.

The findings of the Commission that the holders of common and preferred stocks

(approximately $37,810,200) of the debtor and all unsecured creditors whose claims are not entitled to priority over mortgages of the debtor, including advances by Western Express Company in the sum of $10,-000, Canadian Pacific in the sum of $32,-981,918.52, and interest guaranty on Wisconsin Central First and Refunding bonds in the sum of $777,000, are without value and that there is nothing to be distributed to them, are found to be fair, equitable and just, and in all things sustained by the record herein. They are therefore affirmed and approved.

### Clarification and Modification of Plan.

Under the terms of the plan, it is provided that "the court shall have the power to cure any defect, supply any omission, or reconcile any inconsistency in such manner or to such extent as may be necessary or expedient in order to carry out the plan effectively." It appears that, in order to clarify and make effective the provisions of the plan relating to the disaffirmance of certain agreements of the debtor therein listed, the following minor modification of the plan, which will not require its reference back to the Commission, should be made:

(a) The paragraph (Printed record, p. 1294) commencing, "The following agreements made by the debtor" should be modified so as to read as follows: "The following agreements made by the debtor in addition to those previously disaffirmed by the debtor's trustees shall not be assumed by, or be binding on, the reorganized company."

(b) The paragraph (Printed record, p. 1295) commencing, "Any claims against the debtor" should be modified so as to read as follows: "Any claims against the debtor arising from or in connection with said agreements or the provision of this plan relating thereto, to the extent not secured, are construed as general unsecured claims not entitled to priority."

The agreements referred to above which are not to be assumed or to be binding upon the reorganized company, and any claims thereunder which are construed as general unsecured claims not entitled to priority, are as follows:

1. Indenture dated November 1, 1911, between Central Terminal Railway Company, the debtor, and Guaranty Trust Company of New York, as trustee, creating in Central Terminal Railway Company and the debtor a joint and several liability as to principal and interest on First Mortgage Chicago Terminal 4% thirty-year Sinking Fund Gold bonds, due 1941.

2. Guaranty dated August 2, 1912, of the debtor as to interest on Wisconsin Central First and Refunding Mortgage bonds; and agreement dated April 1, 1917, between the Wisconsin Central, the debtor, and Empire Trust Company, as trustee, creating in the Wisconsin Central and the debtor a joint and several liability as to interest on Wisconsin Central First and Refunding bonds.

3. Lease dated April 1, 1909, between the debtor and the Wisconsin Central.

4. Agreements dated May 27, 1890, April 17, 1899, and May 19, 1925, between the debtor and the Canadian Pacific relating to traffic and other matters.

5. Trust agreement between the debtor and Central Hanover Bank and Trust Company, as trustee, dated July 29, 1932, together with extension agreements dated July 14, 1934, and June 15, 1936, securing the debtor's 6% Secured Notes.

6. Trust agreement between the debtor and Bankers Trust Company, as trustee, dated March 1, 1924, securing the debtor's twenty-five year 5½% Gold Notes.

7. Preferred stock exchange agreement dated April 1, 1909, between the debtor, the Wisconsin Central, and others, and Bank of Montreal, relating to the issue of 4% leased-line stock certificates.

The Court finds that such non-assumption and the relegation of any claims thereunder as unsecured claims not entitled to priority to be fair, equitable, and fully sustained by the record.

It may be stated that the provision of the plan appearing on page 1285 of the printed record, which states that the holders of debtor's First Refunding Mortgage bonds "shall receive cash payment from the Canadian Pacific of their guaranteed interest, which matured between January 1, 1938, and January 1, 1941," is construed by the Court to refer only to holders other than the Canadian Pacific Railway Company.

### Allowances for Fees and Expenses.

Claims were filed herein for fees and expenses incurred in connection with the proceedings and reorganization plan. These totaled $249,626.17. After hearing,

the Commission has fixed the maximum limits to be paid out of the estate to each claimant as and for compensation for services rendered and expenses incurred in connection with the proceedings and plan of reorganization to and including June 30, 1942. The maximum limits of final allowances made by the Commission in its order of October 24, 1942, total $151,651.26. Any allowance by the Court must be within such maximum limits. After due consideration of the record before the Commission with respect thereto, the Court finds that the maximum limits so fixed by the Commission as to each claimant for services rendered and expenses incurred to and including June 30, 1942, constitute the reasonable allowances which should be made and allowed to each of the respective claimants herein, without prejudice to the right of any claimant to present a further claim for services rendered and expenses incurred in connection with the plan or proceeding subsequent to June 30, 1942.

After a careful consideration of the entire plan, the Court concludes that its provisions comply with Subdivision b of Section 77 of the Bankruptcy Act; that it is fair and equitable and affords due recognition to the rights of each class of creditors and stockholders; that it does not discriminate unfairly in favor of any class of creditors or stockholders; and that its provisions regarding the participation of the various classes of creditors and stockholders will conform to the requirements of the law of the land. Furthermore, the Court is satisfied that the approximate amounts to be paid by the debtor, or by any corporation acquiring the debtor's assets, for expenses and fees incident to reorganization, have been fully disclosed so far as ascertainable at the date of the hearing herein, and that the plan provides for the payment of all costs of administration and all other allowances made or to be made by the Court. Finally, that all of the statutory prerequisites to the approval of the plan as certified by the Interstate Commerce Commission have been met.

Summarizing, therefore, it may be stated that the plan as certified by the Interstate Commerce Commission, with the clarifications and modifications indicated herein, will be approved; all objections to the plan will be overruled; and fees and expenses will be ordered paid in the amounts fixed as maximum limits by the Commission.

Findings of fact and conclusions of law in harmony herewith and order approving the plan may be presented by counsel for the trustees within five days after the filing of this opinion.